# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

KENYATTA C. ROSS #290-752  :
    Plaintiff

    v.  : CIVIL ACTION NO. RWT-12-3345

WEXFORD HEALTH SOURCES, INC.[1]  :
CORIZON, INC., f/k/a CORRECTIONAL
   MEDICAL SERVICES, INC.  :
AVA JOUBERT, M.D.
COLIN OTTEY, M.D.  :
RENALTO ESPINA, M.D.
STEPHEN RYAN, M.D.  :
LISA SCHINDLER, PHYSICIANS' ASSISTANT
GREG FLURY, PHYSICIANS' ASSISTANT  :
  et al.,
    Defendants  :

## MEMORANDUM OPINION

This 42 U.S.C. § 1983 prisoner civil rights action seeks money damages and injunctive relief for the alleged denial of proper medical care.[2] Kenyatta C. Ross ("Ross"), a Maryland Division of Correction ("DOC") prisoner housed at North Branch Correctional Institution ("NBCI"), claims that prison health care providers have delayed and/or withheld proper diagnostic tests and treatment for an elbow injury sustained in April of 2010, resulting in

---

[1] The Clerk shall amend the docket to reflect the corporate Defendants' separate entities.

[2] Ross also requests appointment of counsel. (ECF No. 17). A federal district court judge's power to appoint counsel under 28 U.S.C. § 1915(e)(1) is a discretionary one, and may be considered where an indigent claimant presents exceptional circumstances. *See Cook v. Bounds*, 518 F.2d 779 (4th Cir. 1975); *see also, Branch v. Cole*, 686 F.2d 264 (5th Cir. 1982). The question of whether such circumstances exist in a particular case hinges on the characteristics of the claim and the litigant. *See Whisenant v. Yuam*, 739 F.2d 160, 163 (4th Cir. 1984). Ross has demonstrated the wherewithal to either articulate the legal and factual basis of his claims himself or secure meaningful assistance in doing so. The issue pending before the court is not unduly complicated. Therefore, there are no exceptional circumstances that would warrant the appointment of an attorney to represent him under §1915(e)(1), and the motion shall be denied.

permanent nerve damage and daily pain and discomfort.[3] Ross names individual health care providers Ava Joubert, M.D., Colin Ottey, M.D., Renalto Espina, M.D., Stephen Ryan, M.D., and Physicians' Assistants ("PAs") Greg Flury and Lisa Schindler.[4] Prison health care providers Wexford Health Sources, Inc. ("Wexford")[5] and Corizon, Inc. ("Corizon," formerly known as Correctional Medical Services, Inc., or "CMS"),[6] also are named in the Complaint.

Defendants Corizon, Joubert, Ottey, Espina and Flury have filed a Motion for Summary Judgment or Motion to Dismiss or in the Alternative for Summary Judgment that shall be treated as a Motion for Summary Judgment. (ECF No. 13). Ross has filed a Motion for Summary Judgment against these Defendants (ECF No. 16) that shall also be construed as an opposition response to which Defendants have replied. (ECF No. 22). Defendant Wexford has also filed a dispositive motion construed as a Motion for Summary Judgment. (ECF No. 18). A hearing is not needed to resolve the constitutional issues presented in the matter. *See* Local Rule 105.6. (D. Md. 2011).

---

[3] Ross unsuccessfully presented his claims against the Medical Defendants to Maryland's Health Care Alternative Dispute Resolution Office in HCA No 2011-686. (*See* ECF No. 16, Ex. 1). To the extent that Ross seeks to raise a claim of medical malpractice or medical negligence against Wexford, Corizon, Joubert, Ottey, Ryan, Schindler or Flury, the Court declines to exercise supplemental jurisdiction, for reasons apparent herein.

[4] Corrections personnel were dismissed from this action on November 26, 2012. (ECF No. 3). Counsel noted appearances for Defendants Schindler and Ryan (ECF No. 9), but did not file a response on their behalf. For reasons noted herein, the care undertaken by Schindler and Ryan would not entitle Ross to damages against them. Accordingly, Schindler and Ryan shall be dismissed.

[5] From July 1, 2005 through June 30, 2012, Wexford was under contract with the State to provide utilization review management services in connection with the delivery of health care to Maryland prisoners. During this period, Wexford did not provide direct medical care to prisoners, but rather reviewed and acted upon requests for referrals for specialty care, surgeries, certain diagnostic tests, and the provision of special medical equipment or devices. On July 1, 2012, Wexford also became the medical contractor for Maryland prisoners. (ECF No. 18, Ex. 1, Affidavit of Joseph Ebbitt, Manager or Risk Management for Wexford).

[6] Corizon, a prison health care provider under contract to provide direct patient care with the State of Maryland prior to July 1, 2012, previously did business as Correctional Medical Services, Inc. ("CMS").

## Standard of Review

Pursuant to Fed. R. Civ. P. 56(a):

> A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The court should state on the record the reasons for granting or denying the motion.

"The party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)). The court should "view the evidence in the light most favorable to....the nonmovant, and draw all inferences in her favor without weighing the evidence or assessing the witness' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002). The court must, however, also abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993), and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)). "The party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [its] pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Rivanna Trawlers Unlimited v. Thompson Trawlers, Inc.*, 840 F.2d 236, 240 (4th Cir. 1988).

## Eighth Amendment Right to Medical Care

In alleging a denial of his Eighth Amendment right to necessary medical care, Ross must prove two essential elements. First, he must satisfy the "objective" component by illustrating a

serious medical condition. *See Hudson v. McMillian*, 503 U.S. 1, 9 (1992); *Estelle v. Gamble*, 429 U.S. 97, 105 (1976); *Shakka v. Smith*, 71 F.3d 162, 166 (4th Cir. 1995); *Johnson v. Quinones*, 145 F.3d 164, 167 (4th Cir. 1998). If he proves this first element, Ross must then prove the second "subjective" component of the Eighth Amendment standard by showing deliberate indifference on the part of Defendants. *See Wilson v. Seiter*, 501 U.S. 294, 303 (1991) (holding that claims alleging inadequate medical care are subject to the "deliberate indifference" standard outlined in *Estelle*, 429 U.S. at 105-06). "[D]eliberate indifference entails something more than mere negligence [but] is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Farmer v. Brennan*, 511 U.S. 825, 835 (1994). Medical personnel "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [they] must also draw the inference." *Id*. at 837. Medical staff are not, however, liable if they "knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent." *Id*. at 844; *see also Johnson v. Quinones*, 145 F.3d at 167. Prisoners are not entitled to unqualified access to health care, *see Davis v. Williamson,* 208 F.Supp.2d 631, 633 (N.D.W.V. 2002), quoting *Hudson v. McMillian,* 503 U.S. 1, 9 (1992)), and mere disagreement with the course of treatment does not state an Eighth Amendment claim. *See Taylor v. Barnett,* 105 F.Supp.2d 438, 487 (E.D. Va. 2000), citing *Wright v. Collins,* 766 F.2d 841m 849 (4th Cir. 1985)).

## Discussion

The following facts are gleaned from the medical record. On April 4, 2010, Ross, who suffers from sickle cell anemia, asthma and renal disease, discussed blood work with Defendant Schindler and indicated he had pain in his right elbow lasting for three weeks. Ross reported a "popping sound with extension" and swelling. Schindler examined the elbow and found mild

4

pain with motion. She diagnosed a sprain and provided an ACE wrap to be used for support for three months. Ross did not appear on April 20, 2010, for a scheduled appointment with Dr. Majid Arnaout. (ECF No. 18, Ex. 3, pp. 1-3). On April 25, 2010, he complained of generalized joint pain and indicated he struck his elbow on his bunk. Ross was prescribed four months of acetaminophen (for pain relief)[7] and indomethacin (for relief of pain and inflammation)[8] by Defendant Flury, who found no swelling and equal grip strength with a slight decrease in elbow extension due to pain. Flury requested that Ross be provided physical therapy ("PT") for the elbow. (*Id.,* pp. 6-0).

Defendant Ryan performed a physical therapy evaluation on May 6, 2010, at which time Ross reported he injured the elbow six weeks earlier while doing pullups. Ryan noted less swelling and further indicated that stretching caused pain. (*Id.,* p. 10). Ross missed his May 18, 2010 PT session, but later reported to Physical Therapist Lloyd Hott, on May 27, 2010, that PT decreased his pain. Ross also told Hott that he used his arms to lift 30% of his weight during a prescribed "dip" exercise. (*Id.,* p. 15). An x-ray of the elbow taken in July, 2010 showed no evidence of acute fracture, disclocation or subluxation. (*Id.*, p. 17).

On January 20, 2011, Flury examined Ross, noting that PT no longer provided therapeutic benefit, and that Ross continued to have pain despite medication. Flury also noted that the elbow had full range of motion but lacked some extension. Ross indicated he could perform his work detail as a dietary attendant carrying up to ten meal trays, but could not do pullups or pushups without pain. (*Id.*, p. 17). An orthopedic consultation was suggested. (*Id.*, p.

---

[7] *See* http://www.drugs.com/acetaminophen.html.

[8] *See* http://www.drugs.com/mtm/indomethacin.html.

19). On January 22, 2011, glucosamine chondroitin[9] was added to Ross's treatment regimen. (*Id.,* p. 21). Ross was seen by PAs and nurses several times during January and February of 2011. On February 15, 2011, he was approved for outside consultation with Dr. Shelton, a pain management specialist at Bon Secours Hospital. (*Id.,* pp. 22-29).

Dr. Shelton indicated an MRI would be needed to explore whether Ross had suffered a tear of the right triceps tendon or an adjacent ligament. (*Id.,* pp. 36 and 38). On May 18, 2011, Flury examined Ross and noted the MRI request was reviewed ad deferred so that Dr Smith, a member of the utilization management team, could speak further with Dr. Shelton. Flury also noted that Ross "continues to defer prescriptions for pain due to his chronic renal disease." (*Id.,* p. 40).

On June 8, 2011, Defendant Ottey again recommended an MRI. (*Id.,* p. 42). The MRI was performed on an unspecified date. A note dated June 20, 2011, states that the MRI showed moderately large elbow joint effusion (swelling), with multiple "filling defects" within the effusion, suggesting synovitis or intraarticular bodies. No chondral lesion or evidence of fracture or ligament tear were found, and muscles and tendons were normal and intact. It was recommended that Ross undergo diagnostic aspiration to evaluate whether he suffered from inflammatory arthropathy or synovitis. (*Id.,* p. 44).

On August 11, 2011, PA Flury noted that the utilization management team recommended that Dr. Shelton, Bon Secours' pain management specialist who already had examined Ross, perform the aspiration, rather than an orthopedist. Attempts to contact Dr. Shelton were unsuccessful, so the procedure was performed by Dr. Espina in the prison clinic. (*Id.,* p. 54). On

---

[9] This dietary supplement is taken for treatment of arthritis. Its degree of effectiveness is not fully known. *See* http://nccam.nih.gov/research/results/gait/qa.htm.

6

August 24, 2011, Dr. Espina used lidocaine as an anesthetic and injected Depo-Medrol[10] into the right epicondyle portion of the elbow.[11] (*Id.,* p. 56). There is no finding as to whether or how much fluid was removed from the joint, what may have caused the fluid buildup, or whether the fluid that was removed was sent for diagnostic testing.[12]

Ross next complained of right elbow pain radiating down his arm with numbness and tingling "so bad I can't use it," during a January 31, 2012 nurse visit primarily scheduled to address other complaints of left knee and ankle pain   Ross was prescribed amitriptyline,[13] glucosaamine chondroitin, Naprosyn[14] and Tegretol.[15] (*Id.,* p. 62). This regimen was continued in February, 2012, when Ross was examined by Dr. Ottey, who also ordered x-rays of Ross's ankle and foot. (*Id.,* pp. 64-67).

By March of 2012, Ross's medical complaints focused on his left knee and ankle problems. (*Id.,* pp. 73-78). On March 27, 2012, Dr. Ryan examined Ross for his complaints of left knee and ankle pain, and ordered physical therapy, which took place on several occasions

---

[10] Depo-Medrol is an anti-inflammatory glucocorticoid used to treat pain and swelling that occur with arthritis and other joint disorders. *See* http://www.rxlist.com/depo-medrol-drug/consumer-uses.htm.

[11] The medical note completed by Dr. Espina references both the left and right elbow. The court assumes the right elbow was injected, and notes that Ross, who was given a local anesthetic for the procedure, would have remedied any misconception as to which arm was injured. Ross alleges the aspiration was not performed properly in order to obtain a diagnosis and that Espina merely injected a substance into the elbow joint. (ECF Nos. 16 at 2 and 17, att. at 2-3).

[12] The medical record is unclear as to the nature of the aspiration. Presumably, the procedure involved arthrocentesis, a procedure that involves removal of excess joint fluid to relieve pain, but can also involve removal of the fluid for testing to diagnose the cause of joint pain and/or the reason for fluid buildup. *See* http://www.healthgrades.com/procedures/arthrocentesis.

[13] Amitriptyline is used to treat syptoms of depression and works on the central nervous system to increase levels of certain chemicals in the brain. *See* http://www.mayoclinic.com/health/drug-information/DR602731.

[14] Naprosyn is a nonsteroidal anti-inflammatory drug that reduces hormones that cause inflammation and pain, and is used to treat pain or inflammation caused by arthritis, tendinitis, bursitis or gout. *See* http://www.drugs.com/naprosyn.html

[15] Tegretol (carbamazepine) has many uses, including use to to decrease nerve impulses that cause pain. *See* http://www.drugs.com/tegretol.html.

during April, 2012. (*Id.,* pp. 79-86), On April 11, 2012, Dr. Ottey continued Ross's medications. Ross continued physical therapy. His primary medical concerns remained left knee and ankle pain. On April 25, 2012, he was prescribed a knee brace. (*Id.,* pp. 87-110). Despite PT and medication, he continued to suffer left knee pain. (*Id.,* pp. 116). He reported both knee and elbow pain to Flury on July 25, 2012. (*Id.,* p. 121). On August 3, 2012, he was seen by Dr. Ali Yahya for knee and elbow pain, and reported that although medication did not control his pain, his discomfort did not impede his daily functioning, including playing basketball and performing squats. (*Id.,* p. 123). He continued to complain of knee pain and received a steroid injection from Dr. Yahya on October 13, 2012. (*Id.,* pp. 124-134).

On December 13, 2012, Ross complained of right elbow pain. Pulses were normal and the area was not swollen. A pain management referral was noted to be pending. (*Id.,* p. 145). On December 24, 2012, PA Jonas Merrill examined Ross, who indicated he had filed this action. (*Id.,* p. 150). Additional x-rays read on January 28, 2012, showed no evidence of fracture. The orthopedic consultation was placed on hold. On January 1, 2013, Ross was approved for six months of "front cuffing" to avoid elbow pain. (*Id.,* pp. 160, 164).

**Analysis**

Preliminarily, the court notes that Corizon, the health care providers' employer prior to July 1, 2012, is named a defendant solely under a theory of vicarious liability, otherwise known as the doctrine of respondeat superior. The law in the Fourth Circuit is well established that the doctrine is inapplicable to § 1983 claims involving entities such as Corizon. *See Love-Lane v. Martin*, 355 F. 3d 766, 782 (4th Cir. 2004) (no respondeat superior liability under '1983); *Nedd v. Correctional Medical Services*, Civil Action No. JFM-92-1524 (D. Md., October 22, 1992), citing *Powell v. Shopco Laurel Co.*, 678 F.2d 504, 506 (4th Cir. 1982); *McIlwain v. Prince*

8

*William Hospital*, 774 F.Supp. 986, 990 (E.D.Va. 1991). Corizon shall be dismissed from this case. To the extent that Wexford employed the named health care providers from July 1, 2012 to the present, it likewise is shielded from vicarious liability for alleged constitutional violations inflicted on Ross by its employees. Wexford's role in utilization review management, however, is subject to additional scrutiny, for reasons noted below.

Nothing in the pleadings or medical record suggests that Dr. Joubert or Dr. Ryan played a significant role in the diagnosis or treatment of Ross's elbow pain. Physicians Assistants Schindler and Flury frequently examined Ross for various complaints, including elbow pain; provided wraps, braces and pain medication; and referred Ross for additional levels of care, including physical therapy, a request for pain management consultation, and examination by prison physicians. There is no support for Ross' inference that Schindler and Flury were less than diligent in performing their duty of care toward him. Likewise, Dr. Ottey followed through to obtain approval for an MRI of the elbow.

Ross's medical care initially proceeded at a conservative, albeit appropriate, pace, up until the time of the MRI. The MRI revealed possible causes of the pain and swelling that required additional diagnostic evaluation to determine whether Ross suffered from arthropathy[16] or synovitis.[17] After the MRI, Dr. Espina played the greatest role in treating Ross, performing an in-house procedure on the elbow on August 24, 2011. The medical record provided the Court, however, does not indicate whether additional diagnostic evaluation referenced in the MRI report were performed on aspirated fluid taken from the elbow joint, nor what additional testing, if any,

---

[16] Arthropathy references diseases of the joint(s), which can arise from many causes, including arthritis, neuropathic disorders, or cardia or pulmonary disease. *See* http://medical-dictionary.thefreedictionary.com/arthropathy.

[17] Synovitis references inflammation of a synovial membrane, is usually painful, especially on motion, and is often characterized by fluctuating swelling due to effusion in a synovial sac. *See* http://medical-dictionary.thefreedictionary.com/synovitis.

might be needed to fully evaluate Ross's worsening joint pain.[18]  Similarly, there is no discussion as to whether additional consultation with pain management specialists, orthopedists, or other "outside" health care providers are under consideration and if so, why the consultations continue to be deferred.  Affidavits discussing such aspects of the case are not included in Defendants' dispositive motions, leaving the undersigned to conclude that these issues may yet to be explored.

For the aforementioned reasons, Defendants Schindler and Ryan are dismissed, Ross's Motion for Summary Judgment is denied, and the Motions for Summary Judgment filed on behalf of Defendants Flury, Joubert, Ottey, and Corizon are granted.  Defendants Wexford and Espina shall supplement their dispositive motion, providing the information and analysis noted above.  A separate order follows.

Date: June 24, 2013  _____/s/_____
ROGER W. TITUS
UNITED STATES DISTRICT JUDGE

---

[18] The medical records reflect that Ross is experiencing pain in other joints and limbs.  It is unclear whether these problems are in any way related to Ross' elbow pain.